994 So.2d 132 (2008)
Bruce A. SPILLMAN
v.
ANCO INSULATIONS, INC., et al.
No. 2007 CA 0763.
Court of Appeal of Louisiana, First Circuit.
September 9, 2008.
*133 Cameron R. Waddell, Jody E. Anderman, Baton Rouge, Louisiana, and Renee M. Melancon, Lisa White Shirley, Dallas, Texas, for Plaintiffs/Appellees, Ione Spillman and Pamela Spillman Nowell.
Gary A. Bezet, Glenn M. Farnet, Baton Rouge, Louisiana, for Defendant/Appellant, Exxon Mobil Corporation.
Before GAIDRY, McDONALD, and McCLENDON, JJ.
GAIDRY, J.
In this case, an employer appeals a judgment rendered against it in a survival action arising from its employee's exposure to asbestos on the job.

FACTS AND PROCEDURAL HISTORY
Bruce Spillman worked for Exxon in various positions from 1945 until 1986 and was exposed to asbestos in the course and scope of his employment. In May of 2005, Mr. Spillman was diagnosed with mesothelioma, a fatal form of cancer caused by exposure to asbestos, and he died in November of that same year. Prior to his death, Mr. Spillman filed suit against Exxon and various other defendants, alleging that his contraction of mesothelioma was *134 caused by their negligence. In its answer, Exxon raised the affirmative defense of workers' compensation immunity. After Mr. Spillman's death, his wife, Ione Spillman, and major daughter, Pamela Spillman Nowell, ("the Spillmans"), pursued the litigation as a survival action under La. C.C. art. 2315.1.
After a bench trial, the court rejected Exxon's affirmative defense of workers' compensation immunity on the grounds that Mr. Spillman's cause of action accrued prior to 1952, when La. R.S. 23:1031.1 became effective, extending workers' compensation coverage to occupational diseases. The court then found that Exxon's conduct was the legal cause of Mr. Spillman's disease and that Exxon knew or should have known that its conduct posed a risk of harm to Mr. Spillman. The trial court awarded the Spillmans $2,500,000.00 for Mr. Spillman's pain and suffering, mental anguish, and loss of enjoyment of life, and set Exxon's virile share at one half of the award, or $1,250,000.00.
Exxon has appealed, alleging that the trial court erred in concluding that Exxon had the burden of proving that Mr. Spillman's cause of action accrued after 1952; that the trial court erred in finding that Mr. Spillman's cause of action accrued before 1952; that there is no evidence to support the trial court's determination that Exxon is strictly liable under La. C.C. arts. 2317 or 2322 for Mr. Spillman's injuries; and that the trial court erred in failing to limit its liability analysis to exposures and events that occurred prior to the effective date of the 1952 Occupational Disease Statute, since the court concluded that Mr. Spillman's cause of action accrued prior to that date.

DISCUSSION

Burden of Proof on Affirmative Defense
Exxon takes the position that the burden of proving that Mr. Spillman's cause of action accrued before 1952 should have been on the plaintiffs. We disagree. Exxon invoked the immunity afforded to employers by La. R.S. 23:1032, which is a special or affirmative defense that the employer bears the burden of proving at trial. Austin v. Abney Mills, Inc., 01-1598 pp. 7-8 (La.9/4/02), 824 So.2d 1137, 1143. In order to prove its entitlement to statutory immunity, Exxon must prove that Mr. Spillman's disease was an occupational disease covered by workers' compensation, which necessarily requires a showing that Mr. Spillman's cause of action accrued after mesothelioma became covered by workers' compensation.

Accrual of Mr. Spillman's Cause of Action
Because the trial court found that Mr. Spillman's cause of action accrued prior to 1952, the court did not address the issue of worker's compensation coverage. On appeal, Exxon alleges that the trial court erred in finding that Mr. Spillman's cause of action accrued prior to 1952 and also alleges that his disease was covered by workers' compensation, either because his cause of action accrued after 1975, or because mesothelioma was covered by La. R.S. 23:1031.1 beginning in 1952.
We will first consider Exxon's argument regarding when Mr. Spillman's cause of action accrued. Although Mr. Spillman was not diagnosed with mesothelioma until 2005, the Louisiana Supreme Court has held that this is not the relevant date in determining when a tort cause of action accrued in a long-latency occupational disease case. Austin v. Abney Mills, Inc., 824 So.2d 1137 (La.9/4/02). A cause of action accrues in a long-latency occupational disease once there has been a significant tortious exposure. Proof of a significant tortious exposure requires evidence *135 that the exposure was significant and later resulted in the manifestation of damages. Id. at 1154. Exposure is deemed "significant" when "asbestos dust has so damaged the body that the fibrogenic effects of its inhalation will progress independently of further exposure." Id. The plaintiffs presented proof of significant tortious exposure via the testimony of Mr. Spillman and of Dr. Victor Roggli.
We are mindful that a reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court's finding. The reviewing court must review the evidence in its entirety to determine whether the trial court's finding was manifestly erroneous or clearly wrong. Stobart v. State through Dept. of Transp. & Development, 617 So.2d 880, 882 (La.1993)
Mr. Spillman testified regarding his asbestos exposure on the job over the years. He started working for Exxon in 1945 on riverboats. He worked on the riverboats as a deckhand, fireman, and oiler until 1949. Most of his time on the riverboats was spent below deck in the engine room or boiler room. He testified that the engine rooms and boiler rooms both had "a heck of a lot" of insulation in them. As a deckhand, he was exposed to asbestos fibers when he would go into the engine room while other workers were working with asbestos. As a fireman and as an oiler, he worked in the engine room around asbestos, which he said was always "flying around."
In 1949, Mr. Spillman began working at the Exxon plant as a helper. He worked as a helper from 1949 to 1954, assisting pipefitters and boilermakers. He said that although he did not normally work with asbestos himself,[1] he worked around people who were working with asbestos, and he was certain that he was exposed to asbestos every day while working as a helper from 1949 until 1954. In 1954, Mr. Spillman entered an apprenticeship program to become a welder, but his job duties and asbestos exposure remained essentially the same as when he was a helper.
In 1956, Mr. Spillman became a welder and continued to work in that capacity until 1986. As a welder, Mr. Spillman wore asbestos gloves and used asbestos blankets, which he sometimes had to cut to size, but did not really work with asbestos himself, unless he had to brush off old pieces of asbestos with a wire brush before welding something. His primary exposure to asbestos as a welder was as a bystander; e.g., he worked around insulators, who were always tearing old asbestos off and reinsulating. He testified that the asbestos was "in the air you breathe . . . just flying around ... [i]t looked like snow falling" and it would land on him.
Dr. Victor Roggli, a pathologist specializing in diseases related to asbestos exposure, testified about asbestos, the process by which it causes injury, and Mr. Spillman's exposures. Dr. Roggli explained that the entire process by which the inhalation of asbestos fibers causes mesothelioma is not known. What is known is that the asbestos fibers, when inhaled, have the ability to get into a cell and alter the genetic content of that cell; eventually, enough changes occur and the cell becomes a cancer cell. Dr. Roggli testified that in Mr. Spillman's case, asbestos fibers would have reached the pleural space and started causing changes at that location within weeks of breathing the first fibers. With asbestos, the latency period for disease *136 is typically decades-long, so a person does not normally become sick from asbestos exposure until many decades after the first exposure. Dr. Roggli testified that the latency period of fifty-nine years from Mr. Spillman's first exposure in 1945 until his diagnosis in 2005 was within the range of what has been reported in medical literature.
Dr. Roggli testified that all of Mr. Spillman's workplace exposures up until the point where his tumor started growing were significant tortious exposures. He testified that there is no known safe level of exposure to asbestos below which mesothelioma will not occur. He stated that Mr. Spillman's exposure to asbestos between 1945 and the 1970's was substantially above background levels,[2] and that it contributed to his mesothelioma. He went on to say that Mr. Spillman's exposures from 1945 to 1949, 1949 to 1952, 1952 to 1954, 1954 to 1975, and 1975 to 1986 were each substantial contributing factors to his mesothelioma. Dr. Roggli testified that the asbestos level in Mr. Spillman's lung tissue sample was higher than that of any other sample from a refinery worker he had ever examined; he went on to say that it was more like those of men who worked aboard ships in the engine room or boiler room, explaining that work below deck results in heavier exposure to asbestos than bystander exposure as a welder because of the confined space.
After a thorough review of the record, we find no merit in Exxon's argument that Mr. Spillman's cause of action accrued after 1975. The trial court concluded that Mr. Spillman's cause of action accrued prior to 1952, and we find no error in this conclusion. The evidence also overwhelmingly supports the conclusion that Mr. Spillman's cause of action accrued prior to 1975.
Exxon next argues that even if Mr. Spillman's cause of action accrued before 1975, mesothelioma was covered by the 1952 version of La. R.S. 23:1031.1. We disagree with this assertion as well. This issue was not reached by the trial court because of its conclusion that Mr. Spillman's cause of action accrued before 1952. Despite the fact that we agree with this conclusion, we will address the issue of workers' compensation coverage of mesothelioma.
In 1975, the legislature revised the provisions of La. R.S. 23:1031.1 regarding coverage for occupational diseases. Under the 1975 revision, "occupational disease" was defined as:
only that disease or illness which is due to causes and conditions characteristic of and peculiar to the particular trade, occupation, process, or employment in which the employee is exposed to such a disease.
Under this version of the statute, mesothelioma is an occupational disease covered by workers' compensation. However, prior to this 1975 amendment, La. R.S. 23:1031.1 included a specific list of occupational diseases which were covered by workers' compensation, and also listed substances which, when they caused disease as a result of occupational exposure, would result in the disease being an occupational disease covered by workers' compensation. Mesothelioma was not a listed disease and asbestos was not a listed substance. Exxon argues that since oxygen and metal were listed substances, and asbestos is a compound of both oxygen and metal, mesothelioma was an occupational disease covered *137 by workers' compensation beginning in 1952 when La. R.S. 23:1031.1 was enacted. Although there is a split among the circuits and the supreme court has not yet addressed this issue, the jurisprudence of this circuit rejects this broad interpretation of the statute proposed by Exxon and holds that mesothelioma was not compensable under the La. R.S. 23:1031.1 prior to the 1975 amendment. Terrance v. Dow Chemical Co., 06-2234 p. 12 (La.App. 1 Cir. 09/14/07), 971 So.2d 1058, 1066. Under this interpretation of the statute, Mr. Spillman's tort claim against Exxon would only be barred by workers' compensation immunity if his cause of action accrued after 1975. Since we have concluded that Mr. Spillman's cause of action accrued before 1952, there is no workers' compensation immunity.

Exxon's Liability
Exxon next argues that it cannot be strictly liable under La. C.C. arts. 2317[3] or 2322.[4] The sole basis for this argument is that Exxon claims there was no evidence that the riverboats on which Mr. Spillman worked contained asbestos so as to present an unreasonable risk of harm under La. C.C. art. 2322. We disagree. Mr. Spillman testified in his depositions that the engine and boiler rooms of the riverboats were full of insulation that was always flying around. He believed this insulation was Johns-Mansville asbestos, and commented that there were always empty Johns-Mansville boxes lying around the room, which he associated with asbestos. Dr. Roggli testified that Mr. Spillman's lung tissue sample contained such a high level of asbestos fibers that it looked more like the sample of a man who worked below deck in a boat than a man who worked in a refinery. Clearly the trial court credited this testimony that the engine and boiler rooms on the riverboats contained asbestos, and we do not find the court's conclusion to be manifestly erroneous or clearly wrong. Furthermore, Mr. Spillman also worked in the Exxon refinery prior to 1952. He testified that he was exposed to asbestos dust every day as a helper in the refinery, beginning in 1949. Thus, we find no error in the trial court's finding that Mr. Spillman was exposed to asbestos on Exxon's premises.
We turn next to Exxon's argument that the trial court erred in considering Exxon's post-1952 actions in determining what Exxon knew or should have known, when the court concluded that Mr. Spillman's cause of action accrued prior to 1952. Although we agree that Exxon's post-1952 knowledge and actions are not relevant to its liability pre-1952, any error the court may have committed in considering it was harmless, as the pre-1952 evidence outlined below reveals that Exxon knew or should have known of the dangers of asbestos exposure to its workers prior *138 to 1952 and failed to exercise reasonable care to prevent Mr. Spillman's injury.
Dr. Richard Lemen, an epidemiologist and expert in asbestos industrial hygiene, testified as to the state of the art and knowledge about asbestos at different points in time. According to Dr. Lemen, commercial use of asbestos started in the mid 1800's, and by the end of the 1800's, there were reports from Britain of lung disease and death in the asbestos industry. By the early 1900's, the United States had x-rays of asbestosis, although the condition was not named asbestosis in the United States until 1928. In 1930, an industrial hygiene hierarchy was set up which called for replacing the toxic substance (asbestos) or, absent that, setting up engineering controls: ventilation, suppressing dust by enclosing the systems, wetting the asbestos to suppress the dust, vacuuming the dust rather than sweeping to further suppress the dust, and "most importantly, giving the workers the sane appreciation of the risks and the diseases." The final level of the industrial hygiene hierarchy was the use of personal protective equipment; i.e., masks and respirators. A 1940 article referred to by Dr. Lemen as the "Mereweather and Price article" discussed education of workers as a preventive measure, which Dr. Lemen stressed was important because workers are more likely to follow dust suppression guidelines if they are aware of the danger of inhalation of asbestos. The Mereweather and Price article specifically discussed dangers to end-users of asbestos such as insulators. Dr. Lemen testified that after 1930, the knowledge of the dangers of asbestos were "fairly widespread information" and opined that if companies were not following the industrial hygiene hierarchy once it was established, this presented an unreasonable risk of harm to the workers. In 1935, two physicians reported seeing lung cancer in patients that also had asbestosis and this brought into question the possibility of a causal connection between asbestos exposure and lung cancer. By the mid 1940's, researchers began reporting mesothelioma, which was extremely rare, in workers exposed to asbestos. In 1946, the Public Health Service made a recommendation of a threshold limit value, which was an amount of asbestos in the air so small as to not be visible to the naked eye.
Dr. Lemen also testified regarding a 1937 internal Exxon document written by Exxon's chief safety inspector, which Dr. Lemen referred to as "the Bonsib document." The Bonsib document discussed the knowledge of asbestos and the health considerations in dealing with asbestos and concentrated on how asbestos was used in the refineries and the petroleum industry and what could be done to reduce exposure to asbestos within the facilities. The 1937 Bonsib document contained the hierarchy for reducing the dust hazard later discussed in the Mereweather and Price article. The document, which was an internal Exxon document, of which publication was prohibited, concluded that any atmosphere in which dust is visible to the naked eye is too dusty to be breathed safely by humans.
Mr. Spillman testified that no one at Exxon ever warned him that exposure to asbestos dust could be hazardous to his health or instructed him to wear a dust mask, and he first learned about the hazards of asbestos in 1988, two years after he retired.
Considering this evidence of Exxon's pre-1952 knowledge and actions, we find that the court did not err in concluding that Exxon knew or should have known of the danger asbestos presented to Mr. Spillman and failed to exercise reasonable care to prevent it. This assignment of error has no merit.

*139 DECREE
For the above reasons, we affirm the judgment of the trial court. All costs of this appeal are to be borne by the defendant, Exxon.
AFFIRMED.
McDONALD, J., concurs and assigns reasons.
McDONALD, J., concurs.
I believe the majority is correct in its analysis and reliance on prior decisions of this court, particularly Terrance v. Dow Chemical Company, 971 So.2d 1058 (La. App. 1 Cir. 9/14/07). And I agree with their decision since we are bound by these prior decisions. However, I believe the analysis found by the Fifth and Second Circuits to be more compelling. See Brunet v. Avondale Industries, Inc., 772 So.2d 974 (La.App. 5 Cir. 12/5/00)., writ not considered 787 So.2d 1006 (La.3/23/01) and Adams v. Asbestos Corp. Ltd., 914 So.2d 1177 (La.App. 2 Cir. 10/28/05). For these reasons, I respectfully concur.
NOTES
[1] Mr. Spillman testified that as a helper, he did occasionally have to remove old asbestos insulation himself, which was a very dusty process.
[2] Dr. Roggli testified that an examination of a lung tissue sample from Mr. Spillman confirmed that he was exposed to asbestos at a rate much higher than that of the general background population.
[3] La. C.C. art. 2317 provides, in pertinent part:

We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody.
[4] La. C.C. art. 2322 provides:

The owner of a building is answerable for the damage occasioned by its ruin, when this is caused by neglect to repair it, or when it is the result of a vice or defect in its original construction. However, he is answerable for damages only upon a showing that he knew or, in the exercise of reasonable care, should have known of the vice or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care. Nothing in this Article shall preclude the court from the application of the doctrine of res ipsa loquitur in an appropriate case.